# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 12, 2013 Session

## STATE OF TENNESSEE v. TIMOTHY P. GUILFOY

**Appeal from the Criminal Court of Davidson County**
**No. 2011-A-779    Monte Watkins, Judge**

**No. M2012-00600-CCA-R3-CD - Filed May 13, 2013**

Timothy P. Guilfoy ("the Defendant") was convicted by a jury of two counts of rape of a child, four counts of aggravated sexual battery, and one count of assault. After a hearing, the trial court sentenced the Defendant to twenty years for each of the rapes, ten years for each of the aggravated sexual batteries, and six months for the assault. The trial court ordered partial consecutive service, resulting in an effective sentence of seventy years to be served in the Tennessee Department of Correction. In this direct appeal, the Defendant contends as follows: (1) the trial court erred in allowing the State to ask leading questions of one of the victims; (2) the trial court erred in admitting two expert opinions; (3) the trial court erred in admitting recordings of phone calls between the Defendant and the victims' mother; (4) the trial court erred in admitting the videotaped forensic interviews of the victims as substantive evidence; (5) the State's election of offenses was ineffective; (6) the evidence is not sufficient to support his convictions; (7) cumulative errors entitle him to a new trial; and (8) his sentence is excessive. Upon our thorough review of the record and applicable law, we merge the Defendant's two convictions of aggravated sexual battery entered on Counts One and Two into a single conviction of aggravated sexual battery. We also merge the Defendant's two convictions of rape of a child into a single conviction of rape of a child. Finally, we merge the Defendant's conviction of assault into his conviction of aggravated sexual battery entered on Count Three. In light of our holdings, we remand this matter for a new sentencing hearing. The Defendant's convictions are otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed in Part,**
**Modified in Part; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

James O. Martin, III (on appeal) and Bernard McEvoy (at trial), Nashville, Tennessee, for the appellant, Timothy P. Guilfoy.

Robert E. Cooper, Jr., Attorney General & Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson III, District Attorney General; and Sharon Reddick and Roger Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

In June 2009, the Defendant was charged with three counts of aggravated sexual battery against J. A., a victim less than thirteen years old; two counts of aggravated sexual battery against T. A., a victim less than thirteen years old; four counts of aggravated sexual battery against A. A., a victim less than thirteen years old; and four counts of rape of a child against A. A.[1] All of the aggravated sexual battery offenses were alleged to have taken place "on a date between October 1, 2005 and September 20, 2008." All of the rape of a child offenses were alleged to have taken place "on a date between July 1, 2007 and September 30, 2008." On March 30, 2011, the State entered a nolle prosequi as to these charges.

On March 11, 2011, the Defendant was charged with four counts of aggravated sexual battery against J. A., a victim less than thirteen years old (Counts One through Four); one count of aggravated sexual battery against T. A., a victim less than thirteen years old (Count 5); and three counts of rape of a child against T. A. (Counts Six through Eight). All of these offenses but the one alleged in Count Eight were alleged to have taken place "on a date between October 1, 2005 and September 30, 2008." The offense alleged in Count Eight was alleged to have occurred "on a date between July 1, 2007 and September 30, 2008."

The Defendant initially was tried before a jury in July 2011, and a hung jury resulted. The Defendant was retried before a jury in October 2011, during which the State nolled Count Five. At the Defendant's second jury trial, the following proof was adduced:

Jennifer A., the victims' mother ("Mother"), testified that, when she and her three daughters moved to Nashville from Indiana in 2005, they began living at the Biltmore Apartments. Her father, Brian Schiff ("Grandfather"), was living there at the time, and they moved in with him. It was a two-bedroom apartment, and she described the living conditions as "pretty crunched." After several months, Grandfather purchased a nearby house on Saturn Drive, and they all moved into the house. Mother stated that, when they moved into the

---

[1] It is this Court's policy to identify the victims of sexual crimes only by their initials.

house on Saturn Drive, it had an unfinished basement and an unfinished attic. She used the attic as her bedroom except in the summertime. The girls slept on the main floor but did not have their own separate bedroom. The girls' sleeping accommodations included a bunk bed, a futon, and a couch that pulled out to a bed. Usually, J. A. slept in the top bunk of the bunk bed.

While they were still living in the apartment, Mother became acquainted with the Defendant. He and his roommate lived next door to them. The Defendant came to visit Mother and her family in Mother's apartment. Mother and her family also visited the Defendant in his apartment. Mother described their relationship as "friends" and denied that there was ever any romantic interest on either her or the Defendant's part. She added that the Defendant was a "really good friend."

Not long after Mother and her family moved to the house on Saturn Drive, the Defendant moved out of his apartment to another location in Nashville. The Defendant visited them at their house on Saturn Drive. A few months later, the Defendant moved to Missouri. The Defendant continued to stay in touch through phone calls and visits.

Mother explained that the Defendant worked in marketing tours and would come to Nashville to participate in events such as the "CMA festival." He usually would drive to town in a tour vehicle, and he would stay with Mother and her family at the Saturn Drive house. In this way, he was able to keep the per diem he was paid for hotels. Mother stated that she and her daughters enjoyed having the Defendant stay with them.

Mother stated that it was not her intention that the Defendant spend the night sleeping in any of the girls' beds, but she knew that he did because she would find him in one of their beds in the morning. She remembered one particular occasion when she saw the Defendant in bed with J. A. in the top bunk of the bunk bed. At that time, the bunk bed was in the dining room. She also recalled finding the Defendant in bed with T. A. on "[m]ultiple" occasions. She did not say anything to the Defendant about his presence in bed with her children.

In May of 2008, Mother, the girls, and the Defendant planned a camping trip to celebrate J. A. and Mother's birthdays, which were close together in time. Mother stated that they camped two nights, and everyone had a good time.

Mother decided that she wanted to leave Nashville and move to Clarksville. The Defendant had expressed an interest in real estate investment, specifically, purchasing a house and renting it out. When Mother told him she was interested in moving to Clarksville, he purchased a house there, and she rented it from him. She stated that the rent was $700 a

month. She also testified that the Defendant told her that she "wouldn't ever have to worry about just being kicked out of the house." Mother testified that the Defendant realized that she "might not always be able to come up with seven hundred dollars." She also stated that the Defendant was welcome to spend the night there. She added that it "was supposed to be a permanent move."

One morning in Clarksville, after the girls had gotten on the bus to go to school, Mother spoke with Grandfather over the phone. Grandfather told her that J. A. had told him "what happened." After her conversation with Grandfather about what J. A. had told him, Mother retrieved her daughters from school. Mother subsequently spoke with J. A. and T. A. and then she called 911. Two deputies from the Montgomery County Sheriff's Department responded and she relayed to them what J. A. and T. A. had told her. Mother testified that she called the police regarding the instant allegations on or about March 15th, 2009. The Defendant had been there three days previously.

In conjunction with the ensuing investigation, Mother made several recorded phone calls to the Defendant. She made these calls in March 2009. Mother and her family remained in the Defendant's house for about one more month. The Defendant did not serve her with an eviction notice.

On cross-examination, Mother admitted that she and the Defendant had a formal lease agreement regarding the house. She did not mail rent payments to the Defendant but deposited them twice a month into a bank account the Defendant had established. She also admitted that, whenever the Defendant came to visit, her daughters "rushed to the door and hugged him." She did not see either J. A. or T. A. acting frightened around the Defendant. She acknowledged that, when J. A. was six and seven years old, she was wetting the bed and wore pull-ups.

Mother testified that, when the Defendant was staying with them, she usually fell asleep before he did. She did not tell him where to sleep. While they were living on Saturn Drive, the girls would fight over who got to sleep with the Defendant. She did not intervene in these discussions.

Mother acknowledged that she and her daughters moved to Clarksville in September 2008. She already had been attending a junior college in Clarksville during the summer months. She was not able to pay September's rent, so the Defendant told her that she could pay it later by increasing the rent due in subsequent months. In October, she dropped out of school. She paid part of her rent for the months of October and November. She got a job in December and was able to pay December and January rent. She was fired in February. She earlier had told the Defendant that she would file her federal income tax return early in

order to get her refund and pay him some of the money she owed him. She, however, did not get a refund. Mother remained in the house through at least a portion of May.

Mother admitted that, in early March 2009, the Defendant told her that he was having a hard time making the mortgage payments on the house. She denied that he told her that, if she could not pay the rent, he would have to get a tenant who could.

J. A., born on May 22, 2000, and eleven years old at the time of trial, testified that she had two older sisters, T. A. and A. A. She began living in Nashville "quite a few years ago" in an apartment. She lived with her sisters, Mother, and Grandfather. The Defendant, whom J. A. identified at trial, lived in the apartment next door.

J. A. and her family later moved into a nearby house. The house had a basement, attic, and main floor. Sometimes, Mother used the attic as her bedroom. Grandfather used the basement as his living area. Sometimes the girls used the dining room as their bedroom. They used a regular bed and a bunk bed. J. A. usually slept in the upper bunk bed.

Sometimes the Defendant would spend the night at the house. On some of these occasions, the Defendant would sleep in J. A.'s bunk bed with her. J. A. testified that, on one of these occasions, the Defendant touched her "private" with his hand. She stated that he touched her skin by putting his hand down the front of her pants. She also stated that his hand moved and that she got up and went to the bathroom. She then went to sleep with one of her sisters. J. A. testified that the Defendant touched her in this manner on more than one occasion. J. A. stated that, when the Defendant touched her while in bed with her, she was not sure if the Defendant was awake at the time the touchings occurred.

J. A. also testified that, at another time, she was sitting on the Defendant's lap on the couch. The Defendant put his hand down the back of her pants and then slid his hand under her legs. He touched her "private" on her skin. When shown a drawing of a girl's body, J. A. identified the genital region as the area she referred to as her "private."

J. A. went camping with her family and the Defendant for J. A.'s eighth birthday. This trip occurred after the touchings about which J. A. testified. The Defendant did not touch her inappropriately on this trip.

After a while, J. A. decided to tell Grandfather what had happened. This was some time after she and her family left the house on Saturn Drive and moved into a house in Clarksville that the Defendant owned. Grandfather remained in the house on Saturn Drive. When she told Grandfather what the Defendant had done, he told her to tell Mother. She did not do so, however, because she did not think Mother would believe her. Some time later,

Grandfather told Mother what J. A. had told him but did not identify the Defendant. J. A. then told Mother what had happened. According to J. A., Mother then told her boyfriend. J. A. and T. A. went to school, but Mother came and got them out of school a little later. She took them home and "called the cops." J. A. subsequently was interviewed by a woman named Anne. The interview was videotaped. J. A. also visited a doctor, who examined her. She did not remember what she told the doctor but testified that she would have told the truth.

On cross-examination, J. A. stated that the touching on the couch occurred while she was in second grade. At the time, her sisters were in the room with her. Also home at the time were Grandfather, her grandmother, Mother, and Mother's boyfriend, "Bob-o." J. A. acknowledged that the Defendant's visits were sometimes short, and he did not spend the night. She and her sisters were glad to see the Defendant during his visits. She did not remember the Defendant taking her anywhere by herself. He never said anything to her that made her uncomfortable.

J. A. admitted that, at the time the touchings occurred, she wore a "pull-up" because she had a problem with bed-wetting. She stated that she did not know if she was wearing a pull-up when the Defendant touched her on the occasions she testified about. She also stated that the Defendant had been lying behind her and she was facing away from him. She did not know if he was awake or asleep when the touching occurred. She stated that she had watched the videotape of her interview twice.

On redirect examination, J. A. stated that the only thing about the Defendant she did not like was the touchings. She never got mad at him or fought with him. She never saw her sisters or Mother be mad at him. When asked how many times the Defendant touched her inappropriately, she responded, "Maybe three or four times."

T. A., born on February 26, 1999, and twelve years old at the time of trial, testified that she currently lived in Florida with her two sisters, her brother, her father, and her step-mother. She previously had lived in Nashville with her two sisters, Mother, and Grandfather. She was the middle of three daughters.

T. A. identified the Defendant and stated that he lived next door to them while they lived in an apartment in Nashville. T. A. and her family later moved to a house on Saturn Drive. She stated that, while the family lived there, they frequently changed the furniture arrangements because the house was small. At one point, the family room was set up with a bunk bed and a futon. Another time, the bunk bed and a queen-size bed were in the dining room. Usually, T. A. and J. A. slept in the bunk bed, with T. A. on the bottom bunk. T. A.'s

older sister, A. A., usually slept in the queen-size bed. Sometimes, T. A. would sleep on the futon in the family room to "get away from [her] sisters."

T. A. testified that the Defendant spent the night at the house on Saturn Drive "maybe three times." On these occasions, the Defendant slept in the family room or the dining room. On one particular occasion, the Defendant slept in T. A.'s bed. She testified: "I was about to go to bed. It was either on the futon or the bunk bed. I'm not too sure. He had climbed in the bed, and I was already laying down. And he rolled me over and put his hand down my pants." The Defendant touched her "private part" with his finger, on her skin. She added that the Defendant's finger "went inside [her] private part." She left her bed and got in bed with her big sister. She added that she was "not too sure" if the Defendant was awake when this occurred.

T. A. testified that, on another occasion, she was laying on her bunk bed when the Defendant came in and started touching her. She tried to get up, but he held her down. He touched her private part with his finger again, and she "just started crying." She got up, telling him that she had to go to the bathroom. She left and stayed away. T. A. stated that the Defendant had touched her on "[t]he inside." She also stated that this episode caused her to "want to puke."

T. A. testified that, in response to the Defendant's actions, she started wearing khaki pants to bed because they did not have an elastic waistband. She stated that the Defendant touched her another time while she was wearing her khaki pants and that he unzipped and unbuttoned them. This happened on her bunk bed. She testified, "[h]e touched me with his finger on [her] private part on [her] skin on the inside."

T. A. testified that the Defendant touched her more than three times. The touchings were similar to one another. When asked to indicate on a drawing the parts of the body that the Defendant touched, T. A. indicated the female genitalia. When asked what she meant by "inside," she indicated, as reported by the prosecutor for the record, "the outer labia of the female genitalia."

T. A. stated that the touchings occurred before the family camping trip that they took for J. A.'s eighth birthday. She stated that she never told anyone about the touchings. She recalled J. A. telling Grandfather, however, and she remembered when Mother spoke with them while they were waiting for the school bus. T. A. testified that J. A. told Mother what had happened and that Mother began to cry. Both the girls began to cry, too. Nevertheless, the girls got on the bus and went to school.

Mother picked them up from school early that day, and they went to the District Attorney's office. There, T. A. spoke with Anne Fisher. T. A. since had watched the videotape of her interview with Fisher. After the interview, T. A. was examined by a doctor.

T. A. testified that she liked the Defendant other than his touching her. She testified that her mother and the Defendant were good friends.

On cross-examination, T. A. acknowledged that, in July 2011, she testified that the Defendant had not touched her in the same place that a tampon would go. Rather, she had earlier testified that he touched her "[l]ike on top of it," "[l]ike not literally on the outside, but like on the outside of it, yes, but like inside," and "[b]ut on the top, like where something else – like I don't know. Yeah. It wasn't like literally inside, inside, but it practically was. Yes." On cross-examination at trial, she testified that the Defendant touched her inside, where a tampon goes.

T. A. admitted that the Defendant never had threatened her, never had told her that they had a secret, and never had promised her anything for her silence. He did not speak with her about sex or boyfriends, and he never said anything that made her uncomfortable. He never pressed his body against hers, never made her touch his "private part," and never showed his "private part" to her.

On redirect examination, T. A. explained that the Defendant had visited them in the house on Saturn Drive more than four times, but that he would not stay more than three days per visit.

Chris Gilmore testified that he was a school resource officer with the Cheatham County Sheriff's Department but previously had been employed as a police officer with the Clarksville Police Department. On March 18, 2009, he responded to Mother's address on an allegation of child rape. From Mother, he gathered basic information. He did not speak to any children. He notified the appropriate persons within the police department for follow-up.

Detective Ginger Fleischer of the Clarksville City Police Department testified that she was assigned to investigate the matter reported by Mother. Because the alleged criminal conduct had taken place in Nashville, she contacted the appropriate Nashville authorities. Detective Fleischer and Detective Fleming of the Davidson County Police Department determined that a "controlled phone call" between Mother and the Defendant would be helpful to the investigation. She explained to Mother that the phone call would be monitored and recorded. The phone call was scheduled to take place on March 24, 2009, the day after the forensic interview of the children. On that day, Mother made three phone calls to the

Defendant, and all three phone calls were recorded and transcribed. The recordings were admitted into evidence and played for the jury. A fourth recorded phone call was made by Mother to the Defendant on the next day. This recording also was admitted into evidence and played for the jury. Additionally, the transcripts of all the recorded phone calls were admitted.

Hollye Gallion, a pediatric nurse practitioner with the Our Kids Center in Nashville, testified that she performed medical examinations on J. A. and T. A. on April 21, 2009. In conjunction with performing the exams, she reviewed the medical history reports given by the children to a social worker. J. A. reported that "a guy named Tim" had touched the outside of her butt and the outside of her "tootie" with his hands, explaining that she "pee[d]" out of her "tootie." J. A. reported that the touching had occurred more than once. Asked if she remembered the first time, J. A. reported, "It was in our old house in Nashville; I was around six or seven years old."

Gallion testified that J. A.'s physical examination was "normal." She did not find "any injuries or concerns of infection." She also stated that the results of the physical examination were consistent with the medical history that J. A. reported. Gallion added, "Touching typically doesn't leave any sort of evidence or injury."

Gallion testified that, in giving her medical history to the social worker, T. A. reported that the Defendant had touched the outside of her "too-too" with his hand, explaining that she "pee[d]" from her "too-too." T. A. reported that the touching had occurred more than once and that she was "around five or six" the first time. On conducting a physical exam, Gallion concluded that T. A.'s genital area and her "bottom" "looked completely healthy and normal." Gallion added that T. A.'s "physical exam was very consistent with what her history was."

Anne Fisher Post, a forensic interviewer employed by the Montgomery County Child Advocacy Center, testified that she conducted forensic interviews of J. A. and T. A. These interviews were recorded and, without any contemporaneous objection from the Defendant, the recordings were admitted into evidence but were not played for the jury in open court.

The State rested its case after Post's testimony and then delivered to the jury the following election of offenses:

> Count one of the indictment alleges an act of aggravated sexual battery

against J[.] A[.], date of birth 5-22-2000, and refers to the following conduct:

The defendant touched J[.] A[.] on the outside of her genitals on the skin, when he put his hand down the front of her sleeping pants. The incident occurred on the top bunk of the bunk beds in the dining room, and the incident concluded when J[.] got up and went to the bathroom.

Count two of the indictment alleges an act of aggravated sexual battery against J[.] A[.], date of birth 5-22-2000, and refers to the following conduct:

The defendant touched J[.] A[.] on the outside of her genitals, on the skin, when he put his hand down the front of her sleeping pants. The incident occurred on the top bunk of the bunk beds in the dining room, and the incident concluded when J[.] got up and moved to her sister's bed.

Count three of the indictment alleges an act of aggravated sexual battery against J[.] A[.], date of birth 5-22-2000, and refers to the following conduct:

The defendant touched J[.] A[.]'s buttocks on the skin when he put his hand down the back of her pants as she sat on his lap in the living room.

Count four of the indictment alleges an act of aggravated sexual battery against J[.] A[.], date of birth 5-22-2000, and refers to the following conduct:

The defendant touched J[.] A[.]'s genitals on the skin when he put his hand down the back of her pants and moved his hand under her buttocks to touch her genitals as she sat on his lap in the living room.

Count five of the indictment is withdrawn from consideration.

Count six of the indictment alleges an act of rape of a child against T[.] A[.], date of birth 2-26-99, and refers to the following conduct:

The defendant touched T[.] A[.] on the inside of her genitals after she tried to get up from her bed, and he held her down by putting his arm across her torso. The defendant put his hand down the front of her sleeping pants and moved it around, and she started to cry. This incident occurred on the bottom bunk of the bunk beds.

Count seven of the indictment alleges an act of rape of a child against T[.] A[.], date of birth 2-26-99, and refers to the following conduct:

The defendant touched T[.] A[.] on the inside of her genitals, when he put his hand down the front of her sleep pants and moved it around. This incident concluded when she felt like she was going to, quote, puke, and she got up and went to the bathroom.

Count eight of the indictment alleges an act of rape of a child against T[.]A[.], date of birth 2-26-99, and refers to the following conduct:

The defendant touched T[.] A[.] on the inside of her genitals after he unbuttoned and unzipped her, quote, uniform pants and put his hand down the front of her pants.

The defense called Francene Guilfoy, the Defendant's mother. She testified that the Defendant moved to Nashville in August or September 2005 for an internship at Sony Records. When the internship concluded in January 2006, he returned home to his parents' house in Kirkwood, Missouri, a suburb of St. Louis. The Defendant worked at a number of part-time jobs until he was hired in May 2007 by Kerry Group, a marketing firm. His job was "mobile marketing," which required him to drive a tractor-trailer and attend public events such as county fairs and football games, where he would market a client's product. Between the time that the Defendant returned home and May 2007, he travelled to Nashville "[p]eriodically."

Francene[2] testified that, in 2008, the Defendant became interested in purchasing a rental property. He looked at several properties located near St. Louis as well as some in Tennessee. Eventually, he purchased a rental property in Tennessee.

The Defendant was unemployed during the period December 2008 to March 2009. He was living with Francene and her husband, the Defendant's father, and actively seeking work. Francene described the Defendant's state of mind during this period as "depressed." She added, "It bothered him a lot that he didn't have a job and couldn't pay his bills." The Defendant argued with his brother, who also was living in the parental home, about money that his brother owed him. This argument occurred in mid-March 2009. Francene described the argument as "very heated" and "loud and mean."

---

[2] Because several witnesses with the surname Guilfoy testified, we refer to each by his or her first name to avoid confusion. We intend no disrespect.

Francene testified that the Defendant had visited Tennessee earlier in March 2009 but returned home on March 11. The next day, the family, including the Defendant, his parents, and his brother and sister, went to dinner to celebrate the Defendant's father's birthday. The Defendant told her that his trip to Tennessee was "to confront his tenant about the rent situation." She knew that his tenant was Mother.

On cross-examination, Francene acknowledged that, during his internship, the Defendant lived in an apartment building. She visited him there but did not remember the name of the apartments. She did not meet Mother while she was there. She was aware that, after the Defendant left Nashville, sometimes he would stay with Mother on return trips. She also was aware that the Defendant was sleeping with T. A. and J. A. She testified, "He told me it was uncomfortable. He didn't like it. And he told [Mother] to stop it."

Matt Jaboor testified that he lived in St. Louis and was "[v]ery good friends" with the Defendant. In January 2009, he went with the Defendant to Clarksville to help him do some work on the rental house. J. A. and T. A. were excited to see the Defendant and gave him a hug. Throughout the three days that he and the Defendant spent at the house, the girls constantly were trying to help and "to be around" them. While they were there, Jaboor stayed in a room in the basement by himself. The Defendant slept upstairs. One night, Jaboor went upstairs to use the bathroom, and he observed the Defendant sleeping on the couch by himself.

Tony Guilfoy, the Defendant's older brother, testified that he had met Mother on three occasions. On one of these occasions, the children were present and very excited to see the Defendant, who was also present. Tony testified that he had held a job similar to the Defendant's for Kerry Group. When he travelled for that job, he was paid a per diem for housing and food. If he spent his nights with a friend instead of at a hotel, he was allowed to keep the per diem. He stated that the per diem was about eighty-five dollars a day.

Tony also testified that he accompanied the Defendant to look at some of the rental properties the Defendant was considering. He told the Defendant that he thought it would be a good idea to purchase a rental home near a military base.

In late 2008 and early 2009, he and the Defendant were both living at home with their parents. The Defendant was not working at this time and, as a result, was "very depressed." The Defendant spoke with Tony about Mother not paying her rent. On March 24, 2009, before the Defendant got a phone call from Mother, Tony and the Defendant had their "worst argument ever" over money.

Patrick Guilfoy, the Defendant's father, testified that the Defendant was living at home and out of work in late 2008 and early 2009. The Defendant actively was looking for a job because he "wanted to work." Patrick was aware of the Defendant's rental property in Clarksville, Tennessee, and that, starting in December 2008, the Defendant was not being paid the rent. Shortly before March 12, 2009, the Defendant travelled to Clarksville to see about the house. Patrick testified that he told the Defendant that he should evict the tenant because she was not paying rent and that he should get rid of the house. Patrick testified that the Defendant responded, "I know. I just – I know I got to do this. But she's my friend."

The defense rested after Patrick's testimony. The jury retired to deliberate and subsequently found the Defendant guilty of aggravated sexual battery on Count One; aggravated sexual battery on Count Two; aggravated sexual battery on Count Three; assault on Count Four; rape of a child on Count Six; rape of a child on Count Seven; and aggravated sexual battery on Count Eight. The trial court later sentenced the Defendant to ten years on each of the aggravated sexual battery convictions; twenty years on each of the rape of a child convictions; and to six months on the assault conviction. The trial court ordered partial consecutive service for an effective sentence of seventy years in the Tennessee Department of Correction. The trial court denied the Defendant's motion for new trial, and this appeal followed.

The Defendant raises the following issues: (1) the trial court erred in allowing the State to ask leading questions of J. A.; (2) the trial court erred in admitting two expert opinions; (3) the trial court erred in admitting the recordings of the phone calls between the Defendant and Mother; (4) the trial court erred in admitting the videotaped forensic interviews of the victims as substantive evidence; (5) the State's election of offenses was ineffective; (6) the evidence was not sufficient to support his convictions; (7) cumulative errors entitle him to a new trial; and (8) his sentence is excessive. We will address each of these contentions in turn.

## **Analysis**

### *Leading Questions*

After the prosecutor elicited J. A.'s testimony about the Defendant touching her while they were both in the top bunk, after which she got up and went to the bathroom, the prosecutor engaged in the following colloquy with J. A.:

Q. Do you remember a time when that happened that you did something else after it happened?

A. No.

Q. It has been about four years ago that this happened, right, or three – almost three to four years ago.  Right?

A. Yes.

Q. Right after it happened, you talked to a lady named Anne?

A. Yes.

Q. Or a lot sooner or a lot closer to the time?

A. Yes.

Q. And you've also talked to me about it before, a long time ago. Right?

A. Yes.

Q. Do you remember telling Anne or telling me about a time –

At this point, defense counsel objected on the basis that the State was asking leading questions.  The trial court responded, "Well, she has to lead somewhat because of the age of the child.  But try to limit as much as you can."  The prosecutor then asked J. A., "Do you remember telling Anne or telling me about a time that he did that, and you got up and went and got in your sister's bed?"  J. A. responded, "Yes.  But I am not quite sure like what happened."  The following colloquy ensued:

Q. What do you remember about getting out of your bed and going and getting in your sister's bed?

A. I'm not really sure what happened.

Q. Was [the Defendant] in your bed?

A. Yes.

Q. And had he touched your private?

A. Yes.

-14-

Q. And do you remember what he touched your private with?

A. His hand.

Q. And did his hand touch your private on the skin or over your clothes?

A. Skin.

Q. How was it that he was able to touch your private on the skin that time?

A. He put his hand in the front of my pants.

Q. Did his hand move or stay still or something else?

A. No.

Q. Now, when you got up and got in bed with your sister, which sister are you talking about?

A. I think it was A[].

The Defendant complains that the State's leading questions were the foundation for its election of offenses as to Counts One and Two and contends that "the only distinction offered to the jury between [these] offenses is the testimony of the attorney for the State and not [his] accuser."

As recognized by the Defendant in his opening brief, our rules of evidence provide that "[l]eading questions should not be used on the direct examination of a witness *except as may be necessary to develop the witness's testimony*." Tenn. R. Evid. 611(c)(1) (emphasis added). This Court reviews a trial court's decision to allow leading questions on direct examination for an abuse of discretion. See State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993).

In this case, the witness, J. A., was eleven years old at the time of trial. The events about which she was testifying had occurred before her eighth birthday. Thus, a significant period of time had elapsed between the events at issue and the trial. Moreover, this Court frequently has recognized the propriety of leading questions during the direct examination of a child victim of sex abuse. See, e.g., Swafford v. State, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975); State v. Jonathan Ray Swanner, No. E2010-00956-CCA-R3-CD, 2011 WL 5560637, at *6 (Tenn. Crim. App. Nov. 14, 2011), perm. app. denied (Tenn. Mar. 7,

2012); State v. Lee Lance, No. 03C01-9804-CR-00136, 1999 WL 301457, at *4 (Tenn. Crim. App. May 14, 1999), perm. app. denied (Tenn. Nov. 22, 1999); State v. Tom Harris, C.C.A. 86-273-III, 1988 WL 63535, at *2 (Tenn. Crim. App. Jun. 23, 1988), perm. app. denied (Tenn. Nov. 7, 1988). We also note that defense counsel lodged only a single objection to the form of the State's questions during its direct examination of J. A. Under the facts and circumstances of this case, we hold that the trial court did not abuse its discretion in overruling the Defendant's objection. Accordingly, the Defendant is entitled to no relief on this basis.

*Expert Opinions*

Hollye Gallion

During her direct examination of Gallion, the prosecutor asked,

Let me ask you this, put your expert hat on and ask you hypothetically: If [T. A.] [had] said to [the woman taking her medical history] that she was touched by an adult male's hand on the inside of her genitals, would there have been anything inconsistent about the medical exam, with that history given?

Gallion responded, "No. Again, the majority of children we see actually describe some type of penetration. That's one of the reasons that we often see children. Penetration with a hand, a finger, penetration with a penis. Typically those children also have completely normal exams." The Defendant now contends that Gallion's testimony "can be summarized as an opinion that no physical findings could be indicative of anything or nothing at all" and that, accordingly, her opinion was not of assistance to the jury in understanding the evidence or in determining a fact in issue. Cf. Tenn. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."). He also argues that Gallion's opinion "offered to bolster the credibility of T. A. was probative of nothing but extremely prejudicial to [him]."

We agree with the State that this issue has been waived because the defense lodged no contemporaneous objection during this colloquy. See Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 231 n.7 (Tenn. Crim. App. 1988). Moreover, the Defendant does not argue that the alleged error in the admission of this testimony constituted plain error. See State v. Adkisson, 899 S.W.2d 626, 636-42 (Tenn. Crim. App. 1994) (recognizing that, when an issue is otherwise waived, relief may nevertheless be granted on a determination that

plain error was committed).  Accordingly, we hold that the Defendant is entitled to no relief on this basis.

## Anne Fisher Post

Post conducted the forensic interviews of the victims.  During her direct examination of Post, the prosecutor asked the following:

> Now, I want to just ask you a little bit about what you can expect from a forensic interview.
>
> You have testified that you hope – they're designed to give the best and most accurate information possible.
>
> What is your experience in the area of interviewing children who have perhaps been subjected to a number of instances of abuse over a fairly lengthy period of time, beginning when they are very young?
>
> Is it realistic to expect that you'll get every detail from every incident?

Post responded as follows:

> Certainly not.  It depends, too, on the age of the child.  Very little children, we expect to capture only very limited information about any event that happens in their lives.  And there are lots of things that can disrupt a kid's memory of an abuse event.  Trauma can disrupt memory, for example.
>
> And events that are very similar can be very hard to separate.  I think we all know that for [sic] our own experience.  If you have the same event over and over in your own life, it can be very difficult to provide a narrative detailed account of one specific incident of that same event.

The Defendant argues that the trial court's admission of this testimony violated his constitutional rights because Post "was not competent to offer such testimony."  He also contends that the admission of this testimony violated Tennessee Rules of Evidence 701-706 and decisions by the Tennessee Supreme Court and this Court.

As with witness Gallion, however, the defense lodged no contemporaneous objection to the admission of this testimony.  Accordingly, this issue has been waived.  See Tenn. R. App. P. 36(a); Killebrew, 760 S.W.2d at 231 n.7.  Moreover, the Defendant does not argue

-17-

that he is entitled to plain error relief on the basis of this alleged evidentiary error. See Adkisson, 899 S.W.2d at 636-42 (recognizing that, when an issue is otherwise waived, relief may nevertheless be granted on a determination that plain error was committed). Therefore, we hold that the Defendant is not entitled to relief on this basis.

*Admission of Recorded Phone Calls*

At the urging of law enforcement, Mother engaged in four recorded phone conversations with the Defendant with the aim of eliciting incriminating evidence. Because the phone calls referred to events that occurred outside of Davidson County, the defense filed a motion to redact the recordings and the transcripts thereof to remove references to out-of-venue events. The trial court granted this motion.

The Defendant now contends that the admission of the redacted phone calls violated his rights against self-incrimination because Mother was acting as a state agent under the direction of Detective Fleischer. The Defendant acknowledges that he filed no pre-trial motion to suppress the phone calls and that, therefore, he is entitled to relief only if he demonstrates that the admission of this proof constituted plain error.

As indicated above, when an issue is waived on appeal, this Court nevertheless may grant relief on a determination that plain error was committed. See Tenn. R. App. P. 36(b); Adkisson, 899 S.W.2d at 636-42. However, we will grant relief for plain error only when five prerequisites are satisfied:

> (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.

State v. Banks, 271 S.W.3d 90, 119-20 (Tenn. 2008); see also Adkisson, 899 S.W.2d at 641-42. The Defendant bears the burden of demonstrating plain error, and this Court need not consider all five factors "when it is clear from the record that at least one of them cannot be satisfied." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

We hold that the Defendant has not established that he is entitled to plain error relief on this issue because the record supports the inference that his decision not to file a motion to suppress was a tactical decision. This Court has reviewed the transcripts of the phone calls. We note that they are replete with the Defendant's repeated denials that he remembered ever touching the victims inappropriately. The Defendant repeatedly expressed

his concern for the children, his agreement with Mother that she should not tell them that she thought they were lying, and his horror at the allegations. He surmised that, since he did not want to think the children were lying, perhaps he had touched them in some manner while he was asleep.[3] He, however, repeatedly and adamantly refused to admit to the alleged touchings. He repeatedly told Mother that, if he did as she asked and just admitted to the allegations, he would be lying. In short, despite four lengthy and vigorous attempts by Mother to have the Defendant admit to the alleged touchings, he steadfastly refused to do so. It is entirely reasonable, therefore, to infer that the Defendant wanted the jury to hear the phone calls. Accordingly, because the Defendant has not overcome the inference that he made a tactical decision not to seek suppression of the phone calls, the Defendant has failed to establish that he is entitled to plain error relief on this basis.

*Admission of Forensic Interviews*

Without objection, the trial court admitted as substantive evidence the recorded forensic interviews of J. A. and T. A. However, the interviews were not played in open court. Rather, they were made available to the jury during the jury's deliberations. The Defendant contends that the trial court's admission of these interviews constituted plain error entitling him to a new trial.

Once again, however, the Defendant has failed to establish the prerequisites for plain error relief. Although the record clearly demonstrates that the trial court erred in admitting the recordings of the interviews into evidence, the record does *not* demonstrate that the jury ever watched the interviews. Indeed, during closing argument, the prosecutor told the jury the following:

> One thing I do want to mention is, remember the forensic interviews, those tapes, that we did not play those. For one thing, we're lucky to get these to work to play the ones that we did.[4] But those are video. And we don't have the capability out here.

> In the back, in the jury room, should you – obviously, it's your decision whether you want to watch them or not, but should you decide to, we have the capability, or the Court does, to get a TV and all that to play those, those

---

[3] We note that our supreme court has considered at least one case in which the defendant accused of sexual offenses raised a defense of sleep parasomnia. See State v. Scott, 275 S.W.3d 395, 399 (Tenn. 2009).

[4] The State had earlier experienced technical difficulties in playing the recordings of the phone calls between the Defendant and Mother.

forensic interviews, the girls by themselves, with the interviewer in March, April, 2009, when that occurred.

I just mention that sort of as, well, if you wonder why didn't we watch those or hear those, that's the reason.

These comments indicate that, in order to watch the recordings, the jury would have to request the appropriate equipment. The record contains no indication, however, that the jury ever requested the equipment. Nor does the record contain any other indication that the jury watched the recordings. The record is simply silent on this point. Accordingly, the Defendant has failed to satisfy the first prerequisite of plain error review.[5]

Additionally, because the record contains no indication that the jury watched either of the recordings of the forensic interviews, the Defendant cannot demonstrate that the erroneous admission of this evidence adversely affected one of his substantial rights. Accordingly, the Defendant has failed to satisfy at least two of the prerequisites for plain error relief. Therefore, we hold that the Defendant is not entitled to plain error relief on this basis.

*Election and Merger of Offenses*

The Defendant also contends that his convictions of Counts One, Two, Six, and Seven must be vacated and these charges remanded for a new trial because the State's election of offenses as to these crimes was inadequate.[6] The State disagrees.

When the State adduces proof of multiple instances of conduct that match the allegations contained in a charging instrument, the State must "elect" the distinct offense about which the jury is to deliberate in returning its verdict as to each specific count. See State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851

---

[5] The Defendant contends in his reply brief that "[t]he jury is presumed to have considered all the evidence." The Defendant cites to no authority for this contention. We decline to adopt this alleged presumption as an adequate means of satisfying the first prerequisite of plain error review.

[6] In the heading of his argument on this issue, the Defendant alleges that the State's election as to Count Eight was also ineffective. Later in his brief, however, the Defendant concedes that the State's election as to Count Eight rendered it "distinguishable from the other allegations." Upon our review of the record, we agree. Accordingly, the Defendant is entitled to no relief from his conviction of Count Eight on the basis of the State's election of offenses.

S.W.2d 134, 136-37 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 803-04 (Tenn. 1973). As our supreme court has explained,

> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

Adams, 24 S.W.3d at 294. Thus, the primary purpose for the election requirement is to ensure that the jury is deliberating about a single instance of alleged criminal conduct so that the jury may reach a unanimous verdict. See Shelton, 851 S.W.2d at 137. Indeed, our supreme court has characterized this right to a unanimous verdict as "fundamental, immediately touching on the constitutional rights of an accused." Burlison, 501 S.W.2d at 804.

In this case, Counts One and Two charged the Defendant with the aggravated sexual battery of J. A. J. A.'s testimony about these allegations consisted of the following:

> Q. Now, when [the Defendant] spent the night in your house, did he ever sleep in the top bunk with you?
>
> A. Sometimes.
>
> Q. Did something happen when he would sleep in the top bunk with you that caused you to have to come to Nashville today, or this week, and be in court today?
>
> A. Yes.
>
> Q. Can you tell us what happened?
>
> A. [The Defendant] touched me.
>
> Q. Now, when you say he touched you, where did he touch you?
>
> A. My private.

Q. What did he touch you with?

A. His hand.

Q. Now, can you remember, tell us about a time when that happened, what were you doing and what happened? Can you describe it for us?

A. Laying in bed at night.

Q. Had you already gone to bed?

A. I was halfway asleep.

Q. So you had gotten in your bed, and you were halfway asleep?

A. (Witness nods in the affirmative).

Q. And then what happened?

A. He hung out with my mom for a while, and then he would come in my sister['s] and my bed.

Q. I want you to tell us about when he got in your bed, okay, what you can remember about that.

A. Like what?

Q. You said he had hung out with your mom and then he came in your room – I assume he came in the room where you were?

A. Yeah. After a while.

Q. And what room was that?

A. It was in the dining room, I think.

Q. Had you already gone to bed?

A. Yes. I was in my bed.

Q. You were on the top bunk?

A. Yes.

Q. Then what happened?

A. Then he came in my bed.

Q. And then what happened?

A. He touched me.

Q. And when you say he touched you, where did he touch you?

A. My private.

Q. Did he touch your private over your clothes or on the skin or something else?

A. On the skin.

Q. What were you wearing when you went to bed? Do you remember?

A. No. Sometimes I wear pajamas, and sometimes I just sleep in my regular clothes.

Q. Do you remember a time when [the Defendant] got in your bed when you were wearing pajamas?

A. I am not really sure.

Q. Well, what did you usually wear to bed?

A. Just like some shorts or something.

Q. And what do you mean by "shorts"? Can you describe what kind of shorts?

A. Not like jean shorts, but just like comfortable shorts and comfortable shirt or something.

Q. By comfortable shorts, like what kind of waistband did it have?

A. Like stretchy or something.

Q. So when you went to bed at night, you would either wear pajama pants or comfortable shorts. Is that right?

A. Yes.

Q. When [the Defendant] got in your bed with you, do you remember if you specifically had on pajamas or specifically had on comfortable shorts?

A. I don't really remember.

Q. Did the pajamas pants and the shorts pants have the same kind of waistband, basically?

A. Yes.

Q. You have already told us that you remember him getting in bed with you and touching you on your private on the skin. How was it that he was – if you had shorts on, how was it that he was able to touch you on your private on the skin with his hand?

A. He put his hand in my pants.

Q. Do you remember, when he was in the bed with you, if he put his hand down the front of your pants, the side, back, or something else?

A. The front.

Q. Then what did his hand do when he put it down the front of your pants?

A. Just put it on my private.

Q. When he put it on your private, did it move or stay still or something else?

A. Move.

Q. And what did you do when that happened?

A. I got up and went to the bathroom one time.

Q. So you could remember a time that you got up and went to the bathroom?

A. Yes.

Q. What did you do after you went to the bathroom?

A. I went to sleep with my sister.

Q. When you got up, did [the Defendant] say anything to you?

A. I don't remember.

Q. Did you say anything to him?

A. I am pretty sure I said, I am going to the bathroom.

Q. When [the Defendant's] hand was touching you on your private, was it touching on the inside of your private or the outside of your private?

A. Outside.

Q. Can you remember, J[.], that time that you got up and went to the bathroom, before you got up, can you remember how you were laying and how [the Defendant] was laying, or how your body was and how [the Defendant's] body was?

A. I don't know, but I think either I was laying on my side or my back.

Q. So either on your side or your back?

A. Yeah.

Q. Where was [the Defendant]?

A. Next to me.

Q. Was your bed pushed up against a wall, or was it out in the middle of the room?

A. It was pushed against the wall.

Q. Were you laying closer to the wall or was [the Defendant] laying closer to the wall?

A. I think [the Defendant] was laying closer to the wall.

Q. So you told us about a time that you can remember when he got in bed with you, and you had on some kind of stretchy waistband, and he did that, and you got up and went to the bathroom.

Can you tell us about another time that it happened?

A. Where?

Q. That happened in Nashville, at [Grandfather's] house.

A. In my bed or –

Q. Well, let me ask you this first: You described him coming and getting on the top bunk with you and touching your private.

Did that happen that one time that you told us about, or did that happen some other times at [Grandfather's] house in Nashville?

A. It happened some other times, too.

Q. You told us about a time that you remember saying you had to go to the bathroom and getting up and going to the bathroom.

Do you remember a time when that happened that you did something else after it happened?

A. No.

Q. It has been about four years ago that his happened, right, or three – almost three to four years ago. Right?

A. Yes.

Q. Right after it happened, you talked to a lady named Anne?

A. Yes.

Q. Or a lot sooner or a lot closer to the time?

A. Yes.

Q. And you've talked to me about it before, a long time ago. Right?

A. Yes.

. . . .

Q. Do you remember telling Anne or telling me about a time that he did that, and you got up and went and got in your sister's bed?

A. Yes. But I am not quite sure like what happened.

Q. What do you remember about getting out of your bed and going and getting in your sister's bed?

A. I'm not really sure what happened.

Q. Was [the Defendant] in your bed?

A. Yes.

Q. And had he touched your private?

A. Yes.

Q. And do you remember what he touched your private with?

A. His hand.

Q. And did his hand touch your private on the skin or over your clothes?

A. Skin.

Q. How was it that he was able to touch your private on the skin that time?

A. He put his hand in the front of my pants.

Q. Did his hand move or stay still or something else?

A. No.

Q. Now, when you got up and got in bed with your sister, which sister are you talking about?

A. I think it was A[].

J. A. then testified about one occasion during which she sat on the Defendant's lap and he reached into her pants and touched her buttocks and genital area. Later, J. A.'s colloquy with the prosecutor continued as follows:

Q. Did it happen – you said – you told us about two times that he got in bed with you and touched your private. Did it happen more times than that?

A. I am pretty sure it happened more, but I don't know like a time like.

Q. You don't know a specific number of times?

A. Yeah.

Q. Did it happen pretty much the same way every time?

A. Yeah.

Q. He would do basically the same thing each time?

A. Yes.

Q. And you remember a specific time when you got up and went to the bathroom?

A. Yes.

Q. And another specific time when you got up and went to your sister's bed?

A. Yes.

On the basis of this testimony, the State elected its offense for Count One as follows:

> The defendant touched J[.] A[.] on the outside of her genitals on the skin, when he put his hand down the front of her sleeping pants. The incident occurred on the top bunk of the bunk beds in the dining room, and the incident concluded when J[.] got up and went to the bathroom.

As to Count Two, the State elected its offense as follows:

> The defendant touched J[.] A[.] on the outside of her genitals, on the skin, when he put his hand down the front of her sleeping pants. The incident occurred on the top bunk of the bunk beds in the dining room, and the incident concluded when J[.] got up and moved to her sister's bed.

As a close review of the testimony set forth above makes clear, J. A. testified that the Defendant touched her genital region with his hand while they were together in bed on more than one occasion. Despite the State's frequent attempts to characterize her testimony to the contrary, her description of discrete, identifiable events was very limited. Indeed, the only specific incident about which J. A. testified with particularity included *both* her getting out of bed and going to the bathroom *and* then getting into bed with her sister. Moreover, when the prosecutor asked J. A. if she remembered a time when she did something other than go to the bathroom immediately after the Defendant touched her, she said, "No." Thus, based on the actual proof, as opposed to the prosecutor's characterization of that proof, our reading of J. A.'s testimony indicates only a *single* incident of particular criminal conduct. The prosecutor's suggestive phrasing and leading questions did not cure this lack of specificity in the proof. See State v. Evajean Brown, C.C.A. No. 1167, 1988 WL 136600, at *6 (Tenn. Crim. App. Dec. 20, 1988) (recognizing that an attorney's questions are not evidence), perm. app. denied (Tenn. May 8, 1989). Accordingly, we hold that the State's election of offenses for Counts One and Two was ineffective insofar as describing two discrete instances of criminal conduct. Rather, the State's election was an attempt to split a single instance of criminal conduct into two separate instances of criminal conduct.

While such an "election" does not technically violate the election of offenses doctrine, it does violate the Defendant's constitutional rights against double jeopardy.[7] See U. S.

_____

[7] When the State splits a single offense into several offenses at the *commencement* of its prosecution by charging the same offense in more than one count, it has engaged in the improper practice of
(continued...)

Const. Amend. V; Tenn. Const. art. I, § 10; State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996) (recognizing that, under the prohibitions against double jeopardy, "[a] single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution"); see also State v. Ashunti Elmore, No. W2011-01109-CCA-R3-CD, 2012 WL 6475554, at *14 (Tenn. Crim. App. Dec. 13, 2012) (recognizing that "[c]onvicting an individual twice under the same statute for the same act so fundamentally violates federal and state double jeopardy principles that extended analysis . . . is not required"). Accordingly, the Defendant's convictions on these two offenses must be merged into a single conviction of aggravated sexual battery. See Ashunti Elmore, 2012 WL 6475554, at *14 (curing double jeopardy violation by remanding case to trial court for merger of two convictions).

The Defendant also complains that the State's election of offenses as to Counts Six and Seven, crimes alleged to have been committed against T. A., was ineffective. T. A. testified as follows about these offenses:

> Q. Were there times that [the Defendant] would sleep in the bed with you?
>
> A. Yes.
>
> Q. Did anything ever happen on some of those nights that cause us to have to be in court here today?
>
> A. Yes.
>
> Q. Can you tell us, did anything happen that caused us to have to be in court today, did it happen more than one time?
>
> A. Yes.

---

[7](...continued)
"multiplicity." See State v. Desirey, 909 S. W. 2d 20, 27 (Tenn. Crim. App. 1995). As this Court recognized in Desirey, this practice presents two "evils":

> First, as to the trial itself, multiplicity may carry the potential of unfair prejudice, such as suggesting to the jury that a defendant is a multiple offender or falsely bolstering the prosecution's proof on such issues as the defendant's motive or knowledge of wrongdoing. Second, it can lead to multiple convictions and punishment for only one offense. That is, a multiplicitous indictment may lead to a violation of the Double Jeopardy Clause if it results in the imposition of cumulative punishments for only one offense.

Id. (citations omitted).

Q. Did it happen quite a few times?

A. Yes.

. . . .

Q. Can you remember and tell us about another specific time that happened?

A. I was laying on my bunk bed. And he came in and he started touching me. And I tried to get up, but his hand just went over me and like held me so I couldn't get up.

Q. Then what happened?

A. He just started doing it again. And I just started crying.

Q. When you say he started doing it again, what do you mean?

A. Touching me again.

Q. Where was he touching you?

A. On my private part.

Q. What was he touching you with?

A. His finger.

Q. Was he touching your private on the skin or over your clothes?

A. Skin.

Q. How was it that he was able to touch – what were you wearing? How was it that he was able to do that?

A. Same. Elastic band pants, pajama pants.

Q. Did he put his hand down inside your pants?

A. Yes.

-31-

Q. Through the waistband?

A. Yes.

Q. Do you remember how that ended?

A. He just stopped, I guess, or I went to bed.

Q. Was there – this sounds like a weird question, I know. But when he was doing that, how did that make you feel?

A. Felt like – made me want to puke.

Q. Was there a time when you actually did do that?

A. No.

Q. Do you remember a time that you said something about having to puke or throw up?

A. I got up and said I had to go to the bathroom and left and stayed away.

Q. What had happened before you got up and said you had to go to the bathroom?

A. Are you asking if he said anything to me?

Q. No. I mean, you told us just now that you felt like you were going to puke and you got up and said you had to go to the bathroom?

A. (Witness nods in the affirmative.)

Q. What had happened right before you did that, before you got up and said you had to go to the bathroom?

A. He was touching me.

Q. Was that another time that you can remember him doing that?

A. Yes.

-32-

Q. Can you remember, where was he touching you that time?

A. Private part, on the skin, with his finger.

Q. Was his finger touching you on the inside or the outside?

A. The inside.

. . . .

Q. If you can say, how many times did that happen at your grandfather's house in Nashville?

A. I don't know how many times.

. . . .

Q. You said it happened many times, or several times, more than once?

A. Yes.

Q. More than twice?

A. Yes.

Q. More than three times?

A. Yes.

Q. What he did to you, was it similar in time?

A. Yes.

Q. Was there ever a time that he touched you on the outside of your private?

A. No.

On the basis of this testimony, the State made the following election for Count Six:

> The defendant touched T[.] A[.] on the inside of her genitals after she tried to get up from her bed, and he held her down by putting his arm across her torso. The defendant put his hand down the front of her sleeping pants and moved it around, and she started to cry. This incident occurred on the bottom bunk of the bunk beds.

As to Count Seven, the State elected the following incident:

> The defendant touched T[.] A[.] on the inside of her genitals, when he put his hand down the front of her sleep pants and moved it around. This incident concluded when she felt like she was going to, quote, puke, and she got up and went to the bathroom.

Similarly to J. A.'s testimony, a close review of T. A.'s testimony recited above indicates that she was testifying about a *single* incident that was later described by the State in its election as to *both* Counts Six and Seven: the occasion when the Defendant joined her on the bunk bed and, when she tried to get up, he held her down and touched her "private part" with his hand, causing her to feel like she was going to "puke" and ending when she got up saying she had to go to the bathroom. Thus, the State once again split a single episode of criminal conduct into two offenses.[8] As set forth above, the Defendant's constitutional rights against double jeopardy protect him from dual convictions for the same offense. Accordingly, for the reasons set forth earlier in this opinion, the Defendant's convictions on these two offenses must be merged into a single conviction of rape of a child.

Finally, although the Defendant has not challenged the State's election of offenses as to Counts Three and Four, we also are constrained to merge the Defendant's conviction of assault on Count Four with the Defendant's conviction of aggravated sexual battery on Count Three. Both of these counts were based on the single episode of touching that occurred while J. A. was sitting on the Defendant's lap and he put his hand down the back of her pants. As to Count Three, the State elected "the following conduct: The defendant touched J[.] A[.]'s buttocks on the skin when he put his hand down the back of her pants as she sat on his lap in the living room." As to Count Four, the State elected "the following conduct: The defendant touched J[.] A[.]'s genitals on the skin when he put his hand down the back of her pants and moved his hand under her buttocks to touch her genitals as she sat on his lap in the

---

[8] Prior to testifying about the single episode of touching that caused T. A. to both cry and feel like she was going to "puke," she testified about a separate incident. The record does not reveal why the State did not base one of its counts of rape of a child on this separate incident.

living room." The proof in support of these counts consisted of J. A.'s testimony that, on one occasion, while she was sitting on the Defendant's lap on the couch, he put his hand down the back of her pants. Touching her skin, he first touched her buttocks and then slid his hand further forward to touch her "private." Our supreme court has made clear that only one aggravated sexual battery is committed when two prohibited touchings occur in short succession during a single episode. See State v. Johnson, 53 S.W.3d 628, 633 (Tenn. 2001) (holding that, "[i]f the entire instance of sexual contact occurs quickly and virtually simultaneously, then only one offense has occurred, even if more than one touching has occurred").

As it did with its election of offenses as to Counts One and Two and Six and Seven, the State again "elected" to split a single criminal episode into two crimes. The State may not violate a defendant's protections against double jeopardy in this manner. Accordingly, we must merge the Defendant's convictions of aggravated sexual battery and assault under Counts Three and Four into a single conviction of aggravated sexual battery.

*Sufficiency of the Evidence*

The Defendant contends that the evidence is not sufficient to support any of his convictions. The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the

-35-

defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The Defendant was convicted of three counts of aggravated sexual battery and one count of assault (on Count Four) as to J. A. We have determined that the State's "election of offenses" as to Counts One, Two, Three and Four violated the Defendant's double jeopardy protections. Therefore, we have merged the Defendant's convictions of Counts One and Two into a single conviction of aggravated sexual battery. We also have merged the Defendant's conviction of assault on Count Four into his conviction of aggravated sexual battery on Count Three. Accordingly, we will consider the sufficiency of the evidence as to the Defendant's two convictions of aggravated sexual battery against J. A.

Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant" when the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4) (2006). Unlawful sexual contact, in turn, is defined as including "the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6) (2006). A victim's intimate parts are defined as including "the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

As to Counts One and Two, as merged, the Defendant was convicted of touching J. A.'s genital area with his hand while they lay in bed together, after which she got up, went to the bathroom, and got into bed with one of her sisters. J. A. testified to this occurrence, and the proof established that she was less than thirteen years old at the time. We hold that the proof is sufficient to support the Defendant's conviction of aggravated sexual battery.

As to Counts Three and Four, the Defendant was convicted of touching J. A.'s genitals and buttocks on the skin "when he put his hand down the back of her pants as she sat on his lap in the living room." The proof established that J. A. was less than thirteen years old at the time of this touching. She testified that, on one occasion, while she was sitting on the Defendant's lap on the couch, he put his hand down the back of her pants. Touching her skin, he first touched her buttocks and then slid his hand further forward to touch her "private." We hold that this proof is sufficient to support the Defendant's conviction of aggravated sexual battery.

The jury also convicted the Defendant of two counts of rape of a child on Counts Six and Seven. For the reasons set forth above, we have merged the Defendant's convictions on these counts into a single conviction of rape of a child. Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a)

(2006). Sexual penetration includes "any . . . intrusion, however slight, of any part of a person's body . . . into the genital . . . openings of the victim's . . . body[.]" Id. § 39-13-501(7). As set forth above, T. A. testified that, while they were in bed together, the Defendant placed his finger inside her genital region. When asked to indicate on a picture precisely where the Defendant's finger had gone, T. A. indicated, in the prosecutor's words, "the outer labia of the female genitalia." Our supreme court has made clear that "the entering of the vulva or labia is sufficient" to satisfy the element of sexual penetration. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting Hart v. State, 21 S.W.3d 901, 905 (Tenn. 2000)). Accordingly, we hold that the proof is sufficient to support a conviction of rape of a child.

On Count Eight, which charged rape of a child, the jury convicted the Defendant of the lesser-included offense of aggravated sexual battery of T. A. The State described this offense as follows: "The defendant touched T[.] A[.] on the inside of her genitals after he unbuttoned and unzipped her, quote, uniform pants and put his hand down the front of her pants." The State's proof of this offense consisted of the following colloquy between T. A. and the prosecutor:

Q. At some point, did you start wearing a different kind of pants to bed when [the Defendant] came over?

A. Yes.

Q. What did you do? What was the change you made?

A. We have to wear uniforms, so I started wearing my khaki pants.

Q. Started wearing them when?

A. When I went to bed.

Q. What was different about the khaki pants than what you ordinarily wore to bed?

A. They don't have the elastic and they are buttoned up and zipped up.

Q. Why did you start doing that?

A. I didn't want it to happen again.

-37-

Q. So you started wearing these kind of pants when [the Defendant] visited, is that correct, to bed?

A. Yes.

Q. Did it happen again after you started wearing those kind of pants?

A. Yes.

Q. Can you tell us about that?

A. Same thing. Just he unzipped my pants and unbuttoned them.

Q. Where were you when that happened?

A. I was on the bunk bed.

Q. What did he do after he unbuttoned your pants and unzipped them?

A. He touched me with his finger on my private part on my skin on the inside.

We hold that T. A.'s testimony constituted sufficient proof to support the offense of aggravated sexual battery arising from the Defendant's touching her genital region while she was wearing khaki pants. The Defendant is entitled to no relief as to this conviction.

*Cumulative Error*

The Defendant asserts that the cumulative errors committed during his trial entitle him to a new trial on all charges. As set forth above, we have found errors in conjunction with the State's election of offenses. We have addressed those errors specifically and granted appropriate relief. While we have concluded that the trial court committed an evidentiary error regarding the videotapes of the forensic interviews, the record does not establish that the Defendant thereby suffered any prejudice. We have not found error arising from the other issues identified by the Defendant. Accordingly, we hold that the Defendant is not entitled to relief on the basis of cumulative error.

*Sentencing*

Following a sentencing hearing, the trial court sentenced the Defendant to ten years for each of the four aggravated sexual battery convictions and to twenty years for each of the

two rape of a child convictions. The trial court also sentenced the Defendant to six months for the assault conviction. The trial court ordered partial consecutive service such that the Defendant received an effective sentence of seventy years in the Tennessee Department of Correction. The Defendant contends that the trial court erred in its imposition of consecutive service so as to result in an effective sentence of seventy years.

As set forth above, the Defendant's convictions of aggravated sexual battery on Counts One and Two must be merged into a single conviction of aggravated sexual battery. Also, the Defendant's conviction of assault on Count Four must be merged into the Defendant's conviction of aggravated sexual battery on Count Three. Additionally, we have merged the Defendant's two convictions of rape of a child on Counts Six and Seven into a single conviction of rape of a child. In light of these significant alterations to the Defendant's convictions, we conclude that we must remand this case for a new sentencing hearing. See, e.g., State v. Kenneth Lee Herring, No. M199900776CCAR3CD, 2000 WL 1208311, at *9 (Tenn. Crim. App. Aug. 24, 2000), perm. app. denied (Tenn. Feb. 20, 2001). Accordingly, we decline to address the Defendant's contention that the trial court erred in imposing partial consecutive service.

## Conclusion

The Defendant's convictions of aggravated sexual battery entered on Counts Three and Eight are affirmed. The Defendant's convictions of aggravated sexual battery entered on Counts One and Two are merged into a single conviction of aggravated sexual battery. The Defendant's conviction of assault on Count Four is merged into the Defendant's conviction of aggravated sexual battery on Count Three. The Defendant's two convictions of rape of a child on Counts Six and Seven are merged into a single conviction of rape of a child. This matter is remanded to the trial court for further proceedings consistent with this opinion, including amendment of the judgment orders entered on Counts One, Two, Three, Four, Six and Seven to reflect the mergers noted herein and a new sentencing hearing.

_____
JEFFREY S. BIVINS, JUDGE